# 24-2548

## United States Court of Appeals
## for the Second Circuit

JOSEPH VIDAL,

*Plaintiff-Appellant*,

v.

ANTHONY J. ANNUCCI, Acting Commissioner, State of New York Department of Corrections and Community Supervision, ANTHONY RODRIGUEZ, Acting Director of Special Housing Unit/Inmate Disciplinary Program, ERIC CORBETT, Food Service Administrator/Disciplinary Hearing Officer, Great Meadow Correctional Facility, CHRISTOPHER MILLER, Superintendent, Great Meadow Correctional Facility, NICOLE ZIMMERMAN, Offender Rehabilitation Coordinator/Disciplinary Employee Assistant, Great Meadow Correctional Facility, ROD EASTMAN, Deputy Superintendent for Security Services, Great Meadow Correctional Facility, STATE OF NEW YORK, DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, PHIL MELECIO, Deputy Superintendent for Programs, MICHAEL IFFERT, Correction Officer, Great Meadow Correctional Facility, DANIEL STYCZYNSKI, Correction Officer, Great Meadow Correctional Facility,

*Defendants-Appellees*,

(Caption continues inside front cover.)

_____

On Appeal from the United States District Court
for the Southern District of New York
Case No. 18-CV-6184-NSR

_____

**BRIEF *AMICI CURIAE* OF FORMER CORRECTIONS OFFICIALS IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

_____

(*Caption continues from front cover.*)

MATTHEW WATERS, Grievance Supervisor, Great Meadow Correctional Facility, BRADLEE TYLER, Grievance Supervisor, Great Meadow Correctional Facility, BRANDI COLLYER, Grievance Supervisor, Upstate Correctional Facility, STEPHANIE PELO, Grievance Supervisor, Upstate Correctional Facility, SANDRA D. DANFORTH, Deputy Superintendent for Administrative Services, Upstate Correctional Facility, CARL J. KOENIGSMANN, M.D., Deputy Commissioner/Chief Medical Officer, DOCCS, KIMPLY LIPKA, Nurse, Great Meadow Correctional Facility, NANCY SMITH, Nurse Administrator, Upstate Correctional Facility, GEORGE WATERSON, Nurse, Upstate Correctional Facility, LORDI ROSSANNA, Nurse, Upstate Correctional Facility, KATHLEEN K. WHITE, Designated FOIL Officer at Great Meadow Correctional Facility, DAVID INFANTINO, Deputy Commissioner of CORC, DOCCS, LESLIE BECHER, Deputy Commissioner of CORC, DOCCS, ANTHONY WALLACE, Deputy Commissioner of CORC, DOCCS, MARY TANDY-WALTERS, Deputy Commissioner of CORC, DOCCS, OPAL RIVERA, Deputy Commissioner of CORC, DOCCS, DAVID HARVEY, Assistant Counsel, DOCCS, KAREN R. BELLAMY, Former Director, Inmate Grievance Program, CENTRAL OFFICE REVIEW COMMITTEE,

*Defendants.*

_____

MATTHEW MARCHIORI
HOGAN LOVELLS US LLP
555 THIRTEENTH STREET, N.W.
WASHINGTON, D.C. 20004-1109
TEL. (202) 637-6572
FAX (202) 637-5910
MATTHEW.MARCHIORI@ HOGANLOVELLS.COM

PATIENCE M. TYNE
HOGAN LOVELLS US LLP
390 MADISON AVENUE
NEW YORK, N.Y. 10017-2513
TEL. (212) 918-3247
FAX (212) 918-3100
PATIENCE.TYNE@HOGANLOVELLS.COM

*Counsel for Amici Curiae*

ii

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................... ii

STATEMENT OF INTEREST OF *AMICI CURIAE* .................................................1

SUMMARY OF FACTS ........................................................3

SUMMARY OF ARGUMENT ..................................................7

ARGUMENT ....................................................................8

    I.    PROLONGED SOLITARY CONFINEMENT SERVES NO PENOLOGICAL PURPOSE ........................................................7

        A.    Solitary Confinement Does Not Reduce Violence Within Prison Systems ........................................................10

        B.    Solitary Confinement Is Not Cost-Effective .................................13

    II.    PROLONGED SOLITARY CONFINEMENT CAUSES SERIOUS HARM TO INMATES' MENTAL AND PHYSICAL HEALTH..........................................................15

        A.    Solitary Confinement Places Inmates At Risk For Developing Serious Mental Illnesses ....................................18

        B.    Solitary Confinement Often Exacerbates Physical Ailments ........................................................19

    III.    PRISONS CAN LIMIT THE USE OF SOLITARY CONFINEMENT THROUGH INDIVIDUAL CLASSIFICATION WITH MEANINGFUL AND REGULAR REVIEW..........................................................21

CONCLUSION ..........................................................27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page

CASES:

*Fussell v. Vannoy*, 584 F. App'x 270 (5th Cir. 2014) ...............................................21

*Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019) .................................................17, 21

*Porter v. Pa. Dep't of Corr.*, 974 F.3d 431 (3d Cir. 2020).....................................21

*Texeira v. Fischer*, 26 N.Y.3d 230, 43 N.E.3d 358 (2015) .....................................25

*Wolff v. McDonnell*, 418 U.S. 539 (1974) .............................................................25

STATUTES:

N.Y. COMP. CODES R. & REGS. 7, § 1.5
    (u) ........................................................................................................................24
    (v) ........................................................................................................................22

N.Y. COMP. CODES R. & REGS. 7 § 254.5(a) ........................................................25

N.Y. COMP. CODES R. & REGS. 7 § 301.1................................................................23

N.Y. COMP. CODES R. & REGS. 7 § 301.2................................................................23

N.Y. COMP. CODES R. & REGS. 7 § 301.4 ..............................................................24
    (a) ........................................................................................................................23
    (c) (2023) .............................................................................................................23
    (c)(1) ....................................................................................................................23

N.Y. CORRECT. L. § 112 (McKinney)....................................................................25

N.Y. CORRECT. L. § 137 (McKinney)...............................................................24, 26

N.Y. EXEC. L. § 292 (McKinney) ..........................................................................24

OTHER AUTHORITIES:

ACLU, BRIEFING PAPER: THE DANGEROUS OVERUSE OF SOLITARY CONFINEMENT IN
    THE UNITED STATES (Aug. 2014), https://www.aclu.org/sites/default/files
    /assets/stop_solitary_briefing_paper_updated_august_2014.pdf.......................13

ii

ACLU OF TEX. & TEX. CIVIL RIGHTS PROJECT-HOUSTON, A SOLITARY FAILURE: THE WASTE, COST AND HARM OF SOLITARY CONFINEMENT IN TEXAS 9 (Feb. 2015), https://www.aclutx.org/sites/default/files/field_documents/ SolitaryReport_2015.pdf ................................................................................. 11

Allen J. Beck, *Use of Restrictive Housing in U.S. Prisons and Jails, 2011–12*, U.S. DEP'T OF JUST. (Oct. 2015) ....................................................................... 11

ASS'N OF STATE CORR. ADM'RS & THE ARTHUR LIMAN CTR. FOR PUB. INT. L. AT YALE L. SCH., AIMING TO REDUCE TIME-IN-CELL: REPORTS FROM CORRECTIONAL SYSTEMS ON THE NUMBERS OF PRISONERS IN RESTRICTED HOUSING AND ON THE POTENTIAL OF POLICY CHANGES TO BRING ABOUT REFORMS (Nov. 2016), https://law.yale.edu/sites/default/files/area/center/ liman/document/aimingtoreducetic.pdf ............................................................ 21

ASS'N OF STATE CORR. ADMNS. & LIMAN CTR. FOR PUB. INT. L. AT YALE L. SCH., REFORMING RESTRICTIVE HOUSING: THE 2018 ASCA-LIMAN NATIONWIDE SURVEY OF TIME-IN-CELL (Oct. 2018), https://law.yale.edu/sites/default/files /area/center/liman/document/asca_liman_2018_restrictive_housing_released_oc t_2018.pdf ........................................................................................................ 22

Brad Bennett et al., *Solitary Confinement: Inhumane, Ineffective, and Wasteful*, S. POVERTY L. CTR. (2019) ................................................................................... 8

Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement Is Cruel and Far Too Usual Punishment*, 90 IND. L.J. 741 (2015) ................................ 10

CAL RSCH. B., SOLITARY CONFINEMENT: SAFETY AND FISCAL COSTS/SAVINGS (Feb. 2023), https://library.ca.gov/wp-content/uploads/crb-reports/FINALPolicy _Brief_Solitary_Confinement_TDLindsey_TDL_20230222.pdf ..................... 14

Chad S. Briggs et al., *The Effect of Supermaximum Security Prisons on Aggregate Levels of Institutional Violence*, 41 CRIMINOLOGY 1341 (2003) ...................... 10

Ailsa Chang, *'Insane': America's 3 Largest Psychiatric Facilities Are Jails*, NPR (Apr. 25, 2018, 4:56 PM), https://www.npr.org/sections/health-shots/2018 /04/25/605666107/insane-americas-3-largest-psychiatric-facilities-are-jails .... 10

Yi-Ting Cheng et al., *Social Deprivation Induces Astrocytic TRPA1-GABA Suppression of Hippocampal Circuits*, 111 NEURON 1301 (2023) ..................... 20

iii

David H. Cloud et al., *Public Health and Solitary Confinement in the United States*, 105 AM. J. PUB. HEALTH 18 (2015) ..........................................................15

Cheryl Corley, North Dakota Prison Officials Think Outside the Box to Revamp Solitary Confinement, NPR (July 31, 2018, 5:01 AM), https://www.npr.org/2018/07/31/630602624/north-dakota-prison-officials-thinkoutside-the-box-to-revamp-solitary-confineme..........................................12

CORR. LEADERS ASS'N & THE ARTHUR LIMAN CTR. FOR PUB. INT. L. AT YALE L. SCH., TIME-IN-CELL 2019: A SNAPSHOT OF RESTRICTIVE HOUSING BASED ON A NATIONWIDE SURVEY OF U.S. PRISON SYSTEMS (Sept. 2020), https://law.yale.edu/sites/default/files/area/center/liman/document/time-in-cell_2019.pdf ....................................................................................21

Federica Coppola, *The Brain in Solitude: An (Other) Eighth Amendment Challenge to Solitary Confinement,* 7 J. LAW & BIOSCI. 184 (2019) ...................................20

Laura Dellazzino et al., *Is Mental Illness Associated with Placement Into Solitary Confinement in Correctional Settings? A Systematic Review and Meta-Analysis*, 29 INT'L J. OF MENTAL HEALTH NURSING 576 (2020).........................................15

David Fathi, *Supermax Prisons: Cruel, Inhuman and Degrading*, ACLU BLOG (July 9, 2010), https://www.aclu.org/blog/national-security/supermax-prisons-cruel-inhuman-and-degrading............................................................17

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. UNIV. J. LAW & POL'Y 325 (2006)....................................................................19

Stuart Grassian & Terry Kupers, *The Colorado Study vs. The Reality of Supermax Confinement*, 13 CORR. MENTAL HEALTH REP. 1 (2011) ....................................16

Thomas L. Hafemeister & Jeff George, *The Ninth Circle of Hell: An Eighth Amendment Analysis of Imposing Prolonged Supermax Solitary Confinement on Inmates with a Mental Illness*, 90 Denv. U.L. Rev. 1 (2013)..............................18

B.O. Hagan et al., History of Solitary Confinement is Associated with Post-Traumatic Stress Disorder Symptoms Among Individuals Recently Released from Prison, 95 J. URB. HEALTH (2018).......................................................18

U.N. OFF. ON DRUGS AND CRIME, *Handbook on Dynamic Security and Prison Intelligence* (2015), https://www.unodc.org/documents/justice-and-prison-

reform/UNODC_Handbook_on_Dynamic_Security_and_Prison_Intelligence.p df ...............................................................................................................24

U.N. OFF. ON DRUGS AND CRIME, *Handbook on the Management of High-Risk Prisoners* (2016), https://www.unodc.org/documents/justice-and-prison-reform/HB_on_High_Risk_Prisoners_Ebook_appr.pdf.....................................23

Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQ. 124 (2003)......................................................11

Craig Haney, *Restricting the Use of Solitary Confinement*, 1 ANN. REV. OF CRIMINOLOGY 285 (2018) ........................................................................16

Tracy Hresko, *In the Cellars of the Hollow Men: Use of Solitary Confinement in U.S. Prisons and Its Implications Under International Laws Against Torture*, 18 PACE INT'L L. REV. 1 (2006)..........................................................................17

Human Rights Clinic at U. of Tex. Sch. of L., *Designed to Break You: Human Rights Violations on Texas' Death Row* (Apr. 2017), https://law.utexas.edu/wp-content/uploads/sites/11/2017/04/2017-HRC-DesignedToBreakYou-Report.pdf.......................................................................15

Virginia Hutchinson, Kristin Keller, & Thomas Reid, *Inmate Behavior Management: The Key to a Safe and Secure Jail*, U.S. DEP'T OF JUST., NAT'L INST. OF CORR. (Aug. 2009), https://www.govinfo.gov/content/pkg/GOVPUB-J16-PURL-LPS117820/pdf/GOVPUB-J16-PURL-LPS117820.pdf..................22

Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 AM. J. PUB. HEALTH 442 (2014) ..................................................16

Mischa H. Karplus, *Forgotten in Solitary: Mentally Ill Inmates in Solitary Confinement and How the Law Can Protect Them*, 19 STAN. J. CIV. RTS. & CIV. LIBERTIES 97 (2023) .........................................................................16

Terry Kupers et al., *Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs*, 36 CRIM. JUST. & BEHAVIOR 1037 (2009) ...........................12

Lucy Lang, REVIEW OF THE FIRST TWO YEARS OF HALT AT THE NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, STATE OF NEW YORK OFFICES OF THE INSPECTOR

v

GENERAL (2024), https://ig.ny.gov/system/files/documents/2024/08/nys-oig-doccs-halt-report-8.5.24.pdf ................................................................9

Jules Lobel, *Prolonged Solitary Confinement and the Constitution*, 11 U. PA. J. CONST. L. 115 (2008) ..........................................................................17

Mimosa Luigi et al., *Shedding Light on "the Hole": A Systematic Review and Meta-Analysis on Adverse Psychological Effects and Mortality Following Solitary Confinement in Correctional Settings*, 11 FRONTIERS IN PSYCH. 840 (2020) ......................................................................................16

Steve Mills, *Quinn's Prison Plan Causes Stir*, CHICAGO TRIBUNE (Feb. 23, 2012), https://www.chicagotribune.com/news/ct-xpm-2012-02-23-ct-met-illinois-state-budget-prisons-20120223-story.html ..........................................14, 15

Dan Pacholke & Sandy Felkey Mullins, *More Than Emptying Beds:  A Systems Approach to Segregation Reform*, U.S. DEP'T OF JUST. (2016), https://www.bja.gov/publications/MorethanEmptyingBeds.pdf. ........................12

Press Release, Carl E. Heastie, Speaker, N.Y. Assembly, Speaker Heastie Statement on the HALT Solitary Confinement Act (April 1, 2021), https://nyassembly.gov/Press/?sec=story&story=96335. ..................................22

Sharon Shalev, *Solitary Confinement as a Prison Health* Issue, inWHO GUIDE TO PRISONS AND HEALTH (2014) ..............................................................19

David R. Shaw*, Special Review: Management of the California Department of Corrections and Rehabilitation's Administrative Segregation Unit Population*, OFF. OF THE INSPECTOR GEN. (Jan. 2009), https://www.oig.ca.gov/media/reports/ARCHIVE/BOA/Reviews/Management%20of%20the%20California%20Department%20of%20Corrections%20and%20Rehabilitation's%20Administrative%20Segregation%20Unit%20Population.pdf. ........................................................................................14

Sonja E. Siennick et al., *Revisiting and Unpacking the Mental Illness and Solitary Confinement Relationship*, JUST. Q. 1 (2021) ......................................18

Douglas Smith, *Allow the Texas Department of Criminal Justice to Document and Review Its Policies Regarding Confinement in Administrative Segregation*, TEX. CRIM. JUST. COAL. (2015). .........................................................13

vi

Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 CRIME & JUST. 441 (2006).......17

Solitary Watch, *Fact Sheet: The High Cost of Solitary Confinement*, 1 (2011), https://solitarywatch.org/wp-content/uploads/2011/06/fact-sheet-the-high-cost-of-solitary-confinement.pdf. ...............................................................................14

Solitary Watch & Unlock the Box Campaign, CALCULATING TORTURE: ANALYSIS OF FEDERAL, STATE, AND LOCAL DATA SHOWING MORE THAN 122,000 PEOPLE IN SOLITARY CONFINEMENT IN U.S. PRISONS AND JAILS (May 2023), https://solitarywatch.org/wp-content/uploads/2023/05/Calculating-Torture-Report-May-2023-R2.pdf ................................................................................9

Benjamin Steiner & Calli M. Cain, *The Relationship Between Inmate Misconduct, Institutional Violence, and Administrative Segregation*, in *A Systematic Review of the Evidence* in *Restrictive Housing in the U.S.: Issues, Challenges, and Future Directions*, U.S. DEP'T OF JUST. NAT'L INST. OF JUST. (2016) ...............11

Justin D. Strong et al., *The Body In Isolation: The Physical Health Impacts of Incarceration in Solitary Confinement*, 15 PLoS 1 (2020) ................................19

John A. Sturgeon & Alex J. Zautra, *Social Pain and Physical Pain: Shared Paths to Resilience*, 6 PAIN MANAGEMENT (2015) ......................................................20

*Tamms Supermaximum Security Prison Now Closed*, AMNESTY INT'L (Jan. 10, 2013), https://www.amnestyusa.org/victories/tamms-supermaximum-security-prison-now-closed/.........................................................................................14

*Testimony of Craig Haney Before the U.S. Senate Judiciary Subcommittee on the Constitution, Civil Rights and Human Rights* (2012).........................................18

*Testimony of Marc A. Levin, Esq., Director of the Center for Effective Justice at the Texas Public Policy Foundation Before the U.S Senate Judiciary Subcommittee on The Constitution, Civil Rights and Human Rights* (Feb. 25, 2014), https://www.judiciary.senate.gov/imo/media/doc/02-25-14Levin Testimony.pdf .........................................................................................11, 12

*Testimony of Rick Raemisch, Executive Director of the Colorado Department of Corrections "Reassessing Solitary Confinement II: The Human Rights, Fiscal, and Public Safety Consequences"* (Feb. 25, 2014), https://www.judiciary.senate .gov/imo/media/doc/02-25-14RaemischTestimony.pdf. ....................................14

Ilanit Turner & Noelle Collins, *A Call to Reform Federal Solitary Confinement*, RIGHT ON CRIME & TEX. PUB. POL'Y FOUND. 1 (2022), https://rightoncrime.com/wp-content/uploads/2022/01/ROC-ReformFederalSolitaryConfinement-Turner-Collins-12-21.pdf ..........................9

Unlock the Box Campaign, BANNING TORTURE: LEGISLATIVE TRENDS AND POLICY SOLUTIONS FOR RESTRICTING AND ENDING SOLITARY CONFINEMENT THROUGHOUT THE UNITED STATES 4 (Jan. 2023), https://unlocktheboxcampaign.org /wp-content/uploads/2023/01/UTB-BanningTorture-TrendReport-January2023 .pdf ......................................................................................................21

Unlock the Box Campaign, *Data Tracker*, https://unlocktheboxcampaign .org/data-tracker/ (last visited Jan. 31, 2025) ....................................................21

U.S. Dep't of Just., REPORT AND RECOMMENDATIONS CONCERNING THE USE OF RESTRICTIVE HOUSING: FINAL REPORT (Jan. 2016)..................................9, 22, 24

U.S. GOV'T ACCOUNTABILITY OFF., BUREAU OF PRISONS: IMPROVEMENTS NEEDED IN BUREAU OF PRISONS' MONITORING AND EVALUATION OF IMPACT OF SEGREGATED HOUSING (May 2013)..............................................................13, 15

Brie A. Williams et al., *The Cardiovascular Health Burdens of Solitary Confinement*, 34 J. GEN. INTERNAL MED. 1977 (2019).......................................19

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

Former corrections officials Dan Pacholke, Eldon Vail, Dick Morgan, and Phil Stanley respectfully submit this brief as *amici curiae* in support of Plaintiff-Appellant Joseph Vidal's position on the merits and in support of reversal of the district court's decision under review.

Dan Pacholke has a long tenure as an officer for the Washington State Department of Corrections ("WDOC"). Among other positions, he has served as Secretary of the Department of Corrections (October 2015–March 2016), Deputy Secretary (April 2014–October 2015), Director of Prisons (July 2011–April 2014), Deputy Director of Prisons (July 2008–July 2011), and, additionally, as the Co-Director at Vera Institute of Justice (April 2016–August 2017). While in WDOC, he led efforts to reduce the use of intensive management units ("IMUs") that resulted in a fifty percent reduction of those housed in IMUs and an over thirty percent reduction in system-wide violence. This work is described in a 2016 Department of Justice Bureau of Justice Policy Brief, *More than Emptying Beds: A Systems Approach to Segregation Reform*. After serving in the field of corrections for over

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), *Amici* represent that no party opposes the filing of this brief *amici curiae*. Pursuant to Rule 29(a)(4)(E), the undersigned counsel further represent that no party or party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparation or submission of this brief; and that no person other than the *Amici* and counsel identified herein contributed money that was intended to fund preparation or submission of this brief.

thirty-three years, he now provides investigative consulting, academic research, and expert testimony regarding conditions of incarceration.

Eldon Vail is a long-serving corrections official for the Washington State Department of Corrections. He was Secretary of the Department (2007–2011), Deputy Secretary (1999–2006), and Superintendent of three institutions (1987 and 1989–1994). While Secretary, he successfully reduced violence in the state prison system and implemented a wide array of evidence-based programs, including an intensive treatment program for people in prison with mental illness. He has over thirty-five years' experience in the field of corrections. Since his retirement from public service, he has been retained as a correctional consultant or expert witness over sixty times across twenty-three states.

Dick Morgan is a veteran officer and administrator for the Washington State Department of Corrections. He served as Secretary of the Department (March 2016-January 2017), Director of Prisons (2008-2010), and Assistant Deputy Secretary of Prisons (2006-2008). He also served as Superintendent of three different prisons. Additionally, he was appointed to Washington State's Indeterminate Sentencing Review Board, elected to the Walla Walla City Council, and served on the Board of the Washington State Coalition to Abolish the Death Penalty from 2012 until its abolishment in 2023. After retiring from public service with over thirty-five years' experience in the field of corrections, he has been retained as a corrections consultant

2

or expert witness over fifteen times.

Phil Stanley is an experienced corrections administrator serving both the New Hampshire Department of Corrections and the Washington State Department of Corrections. In New Hampshire, he was Commissioner of Corrections (May 2000–November 2003). In Washington, his roles included Director of a regional justice center (2007–2012), Probation Officer (2004–2017), Regional Administrator (1997–2000), and Superintendent (1992–1997). He has over fifty years of experience in the field of corrections and is currently a consultant for jail operations.

As former corrections officials with more than 153 years of collective experience, *Amici* have substantial first-hand experience administering secure prisons and reducing the use of solitary confinement. *Amici* are concerned that the use of long-term solitary confinement has been perpetuated under a misguided belief that prisons have no viable alternative for ensuring security. In support of plaintiff's assertion that his solitary confinement implicated his liberty interest and due process rights, *Amici* assert that prison security can be maintained without the extended use of isolation, which has proven dangerous and ineffective. *Amici* respectfully submit this brief to set forth the basis for those views.

## SUMMARY OF FACTS

Mr. Joseph Vidal was incarcerated at Green Haven Correctional Facility ("GHCF") in March 2015. ECF No. 115 ¶ 2. On March 6, 2015, Mr. Vidal switched

3

cells with his belongings, including his prized legal books. ECF No. 49 at ¶17–18; ECF No. 121–1 at 3. Defendant officers told Mr. Vidal that he could not bring one of his bags of legal materials. ECF No. 49 at ¶17–18; ECF No. 121–1 at 3. Mr. Vidal believed that GHCF policy permitted the extra bags, and he got into an altercation with Defendant officers. ECF 49 at ¶ 25–28. Mr. Vidal then received two Inmate Behavior Reports ("IMR") for violating facility policy and for assaulting Defendants. ECF No. 121–2 at 12-14.[2]

After GHCF conducted a disciplinary hearing at which Mr. Vidal was not permitted to call witnesses or offer documentary evidence, Defendant Gutwein imposed a penalty of 270 days in solitary confinement. ECF No. 49 ¶ 50–51; ECF No. 115 ¶ 6–7. Mr. Vidal entered solitary confinement on March 6, 2015, and he remained in solitary confinement for over 180 days.[3] ECF No. 119 ¶¶ 3, 9. During his sentence, Mr. Vidal was transferred to Upstate Correctional Facility ("Upstate"). ECF No. 125 at 5.

For the entirety of his time in solitary confinement, Mr. Vidal was deprived

---

[2] The facts surrounding Mr. Vidal's placement in solitary confinement are in dispute. ECF No. 117; ECF No. 121. Mr. Vidal alleges the IMR charges were falsified. ECF No. 126 ¶ 37.

[3] Mr. Vidal alleges he was in solitary confinement for 258 consecutive days between March 6, 2015 through November 19, 2015. ECF No. 119 ¶ 9. Defendants allege he only served 180 days in solitary confinement from May 23, 2015 to November 19, 2015. ECF No. 115 ¶ 9. In its August 20, 2024 Order, the district court adopted Defendants' account. ECF No. 132 at 5.

of social interaction, adequate nutrition, and basic necessities. Compl. ¶ 126. Mr. Vidal had to endure sleeping on torn and stained bedsheets. *Id.* He wore dirty jumpsuits, which he could not exchange for clean ones. *Id.* Inmates were deprived of showers if, despite freezing temperatures, they did not stand in front of their gate wearing boxer shorts. *Id.*

The conditions Mr. Vidal experienced in solitary confinement greatly differed from conditions for the general prison population. ECF No. 119 ¶ 14. For example, the GHCF general population was entitled to approximately seven hours of recreation time per day, whereas Mr. Vidal was only entitled to one hour of recreation per day while in solitary. *Id.* This meant that for twenty-three hours of the day, Mr. Vidal was severely restricted from interacting with others, could not watch television, and had little time to exercise — he experienced little physical or social stimulation during his solitary confinement. *Id.*; ECF No. 126 ¶ 69. And Mr. Vidal further lost his already-minimal recreation time if he failed to place his shoes on his cell bars after 6:00 A.M. rounds until 10:00 A.M. Compl. ¶ 126.

Mr. Vidal was forced to live in a filthy cell, which was only cleaned once a week and often contained dirty mops and buckets that officers refused to change. *Id.* He only had state-issued clothing, whereas general population inmates were permitted personal clothing and other items. ECF No. 119 ¶ 15. For his entire time in solitary confinement, Mr. Vidal was deprived of adequate nutrition. ECF No. 126

5

¶ 48. Unlike members in general population, individuals in solitary confinement were only given meals consisting largely of soy that were poorly cooked and restricted to small portions. ECF No. 126 ¶ 48-50.

During May and June 2015, the average maximum temperatures outside GHCF reached almost ninety degrees. ECF No. 126 ¶ 42. Mr. Vidal's unit had no ventilation system or fans, which created an extremely hot and humid environment within his cell that became unbearable. ECF No. 126 ¶ 43. General population inmates had ventilation in their units — and even personal fans, if they wanted, to keep cool. ECF No. 126 ¶ 44. But in solitary, Mr. Vidal had to endure such excruciating temperatures for up to twenty-three hours a day, with no ventilation or access to a fan. *Id.*

Further, Mr. Vidal was under pain management treatment when entered solitary confinement; he obtained prescription pain medication from a physician. ECF No. 126 ¶ 56. However, with no warning and without his consent, his treatment was discontinued and replaced with a less effective alternative. ECF No. 126 ¶ 58.

While Mr. Vidal was at Upstate, he suffered hemorrhoid pain — yet he was denied treatment and left in significant discomfort. ECF No. 126 ¶ 60. Mr. Vidal was also denied medication for his stomach, shoulder, and neck pain at Upstate. ECF No. 126 ¶ 61. As a result Mr. Vidal struggled to sleep, which only perpetuated his ailments. ECF No. 126 ¶ 61. Mr. Vidal's only comfort during his confinement was

reading, yet he was denied requested eyedrops when his vision became blurry. ECF No. 126 ¶ 64.

The conditions Mr. Vidal was forced to endure in solitary left him in emotional distress, as he endured agony from being forced to sit on a stool, occasionally confined by restraints and could not shower daily. ECF No. 126 ¶ 69. His denial of basic medical treatment only exacerbated his physical and emotional discomfort. ECF No. 126 ¶ 70.

On July 7, 2018, Mr. Vidal, acting pro se, brought a civil rights action pursuant to 42 U.S.C. § 1983 against New York DOCCS officials alleging, in part, that his solitary confinement and extreme conditions suffered therein violated his Eighth Amendment right against cruel and unusual punishment. Mr. Vidal filed an amended complaint on January 7, 2019 and a second amended complaint on April 26, 2021. The district court granted the defendants' motion for summary judgment on September 26, 2022, and Mr. Vidal promptly appealed to this Court without the assistance of counsel. On March 8, 2024, this Court affirmed the district court and issued a Summary Judgment Order. On August 20, 2024, Mr. Vidal promptly filed a Notice of Appeal without the assistance of counsel.

## SUMMARY OF ARGUMENT

The first-hand experience of *Amici*, across a variety of correctional settings, has led them to understand that extended placement of inmates in solitary

7

confinement is generally harmful and unnecessary to institutional security. In *Amici*'s experience, prolonged solitary confinement serves no penological purpose: prolonged solitary confinement does not reduce violence in prison systems and it exacerbates mental and physical health concerns.

Moreover, to the extent solitary confinement is used at all, it must be based on individual classification with meaningful and regular review. Mr. Vidal's allegations demonstrate that he was not put in solitary confinement after meaningful review, and his segregation for at least 180 days only served to exacerbate his physical and emotional distress.

Accordingly, this Court should rule in favor of Mr. Vidal's contention that prolonged solitary confinement was unconstitutional and should reverse the district court's summary judgment order.

## ARGUMENT

### I. PROLONGED SOLITARY CONFINEMENT SERVES NO PENOLOGICAL PURPOSE.

Known by a variety of names, solitary confinement is restrictive housing that commonly involves between twenty-two and twenty-four hours a day of physical isolation and strict regulations about when, and under what conditions, a inmate may leave their cell.[4] When imposed on a inmate for a limited amount of time following

---

[4] *See, e.g.*, Brad Bennett et al., *Solitary Confinement: Inhumane, Ineffective, and Wasteful*, S. POVERTY L. CTR. 6 (2019).

an individualized assessment, solitary confinement may be an appropriate tool in the correctional arsenal. However, there exists no penological interest in maintaining inmates in *prolonged* solitary confinement.

Studies have shown that solitary confinement does not reduce violence within prison systems. Further, solitary confinement is no longer reserved for the most violent inmates; what was once considered a last-resort disciplinary practice is often a default option when correctional and administrative protocols fail after a first attempt.[5] Such prolific use of solitary confinement is both counterproductive and expensive.[6] Indeed, numerous states have begun to investigate options for reducing their use of solitary confinement.[7]

---

[5] Ilanit Turner & Noelle Collins, *A Call to Reform Federal Solitary Confinement*, RIGHT ON CRIME & TEX. PUB. POL'Y FOUND. 1, 5 (2022), https://rightoncrime.com/wp-content/uploads/2022/01/ROC-ReformFederalSolitaryConfinement-Turner-Collins-12-21.pdf.

[6] "[P]risons and jails across the U.S. reported locking more than 122,000 people in solitary confinement for 22 or more hours on a given day in 2019." Solitary Watch & Unlock the Box Campaign, CALCULATING TORTURE: ANALYSIS OF FEDERAL, STATE, AND LOCAL DATA SHOWING MORE THAN 122,000 PEOPLE IN SOLITARY CONFINEMENT IN U.S. PRISONS AND JAILS 4 (May 2023), https://solitary watch.org/wp-content/uploads/2023/05/Calculating-Torture-Report-May-2023-R2.pdf.

[7] *See* U.S. Dep't of Just., REPORT AND RECOMMENDATIONS CONCERNING THE USE OF RESTRICTIVE HOUSING: FINAL REPORT, 72–78 (Jan. 2016), [hereinafter DOJ REPORT AND RECOMMENDATIONS] (noting several States' self-reported claims to be undertaking reform efforts); *e.g.*, Lucy Lang, REVIEW OF THE FIRST TWO YEARS OF HALT AT THE NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, STATE OF NEW YORK OFFICES OF THE INSPECTOR GENERAL (2024), https://ig.ny.gov/system/files/documents/2024/08/nys-oig-doccs-halt-report-8.5.24.pdf.

A. **Solitary Confinement Does Not Reduce Violence Within Prison Systems.**

More than a century ago, the United States abandoned solitary confinement as a failed experiment begetting mental illness rather than rehabilitation.[8] In the past few decades, solitary confinement has returned to America's prisons — partly in reaction to exploding prison populations that coincided with widespread closure of mental institutions.[9] Prisons, however, have been ill-equipped to address the resulting volume of inmates with mental illnesses and the overall increase in violence due to overcrowding.[10]

Correctional officials believed they could pinpoint the "worst of the worst" who most frequently engaged in prison violence and then isolate them to restore order.[11] Many states and the federal Bureau of Prisons built solitary confinement units and "supermax" prisons.[12] Officials expected that removing difficult inmates from the general population would reduce the violence.[13] They were wrong.

---

[8] Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement Is Cruel and Far Too Usual Punishment*, 90 IND. L.J. 741, 746–47 (2015).

[9] *Id.* at 747–51; Ailsa Chang, *'Insane': America's 3 Largest Psychiatric Facilities Are Jails*, NPR (Apr. 25, 2018, 4:56 PM), https://www.npr.org/sections/health-shots/2018 /04/25/605666107/insane-americas-3-largest-psychiatric-facilities-are-jails.

[10] Bennion, *supra* n.7, at 748–51.

[11] *Id.* at 750; Chad S. Briggs et al., *The Effect of Supermaximum Security Prisons on Aggregate Levels of Institutional Violence*, 41 CRIMINOLOGY 1341, 1341–42 (2003).

[12] Bennion, *supra* n.7, at 751–52.

[13] *See* Briggs, *supra* n.10, at 1341–42.

10

The increased use of solitary confinement was "not associated with reductions in facility or systemwide misconduct and violence."[14] As the practice expanded, studies showed that "[f]acilities with higher rates of restrictive housing had higher levels of facility disorder."[15] For example, Texas prisons experienced a 104 percent increase in inmate-on-staff assaults between 2009 and 2015, which correctional staff attributed directly to the overuse of solitary confinement.[16] Psychologists demonstrated that isolation caused social pathology, which led inmates to "occupy this idle time by committing themselves to fighting against the system."[17]

Putting inmates into isolation did not reduce violence. Rather, the available evidence has proved the opposite is true; letting inmates out of solitary confinement resulted in a dramatic decrease in prison violence.[18]

---

[14] Benjamin Steiner & Calli M. Cain, *The Relationship Between Inmate Misconduct, Institutional Violence, and Administrative Segregation*, in *A Systematic Review of the Evidence* in *Restrictive Housing in the U.S.: Issues, Challenges, and Future Directions*, U.S. DEP'T OF JUST. NAT'L INST. OF JUST. 179 (2016).

[15] Allen J. Beck, *Use of Restrictive Housing in U.S. Prisons and Jails, 2011–12*, U.S. DEP'T OF JUST. 13 (Oct. 2015).

[16] ACLU OF TEX. & TEX. CIVIL RIGHTS PROJECT-HOUSTON, A SOLITARY FAILURE: THE WASTE, COST AND HARM OF SOLITARY CONFINEMENT IN TEXAS 9, 44 (Feb. 2015), https://www.aclutx.org/sites/default/files/field_documents/SolitaryReport_2015.pdf.

[17] Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQ. 124, 140 (2003).

[18] *See, e.g.*, *Testimony of Marc A. Levin, Esq., Director of the Center for Effective Justice at the Texas Public Policy Foundation Before the U.S Senate Judiciary Subcommittee on The Constitution*, *Civil Rights and Human Rights*, 3 (Feb. 25, 2014), https://www.judiciary.senate.gov/imo/media/doc/02-25-14Levin Testimony.pdf.

11

Statistics from reforming states demonstrate that reducing long-term isolation decreases violent prison incidents. In Mississippi, as the solitary confinement population plunged, "the number of incidents requiring use of force plummeted . . . . Monthly statistics showed an almost 70% drop in serious incidents, both inmate-on-staff and inmate-on-inmate."[19] In North Dakota, extreme incidents such as suicide attempts and cell flooding used to occur three or more times every week in solitary confinement units; after dramatic reductions in the use of isolation, they now occur only a few times each year.[20]

Barely a year after launching solitary confinement reforms in 2011, Maine prisons reported "[s]ubstantial reductions in violence" and an overall reduction in the level of harm inmates endured.[21] In Washington, a dramatic drop in violence followed solitary confinement reforms and a group violence deterrence strategy.[22] "In the model's first year of implementation at its pilot facility, assaults against staff,

---

[19] Terry Kupers et al., *Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs*, 36 CRIM. JUST. & BEHAVIOR 1037, 1043 (2009).

[20] Cheryl Corley, *North Dakota Prison Officials Think Outside the Box to Revamp Solitary Confinement*, NPR (July 31, 2018, 5:01 AM), https://www.npr.org/2018/07/31/630602624/north-dakota-prison-officials-thinkoutside-the-box-to-revamp-solitary-confineme.

[21] *Testimony of Marc A. Levin*, *supra* n.18, at 3 (internal quotations omitted).

[22] Dan Pacholke & Sandy Felkey Mullins, *More Than Emptying Beds: A Systems Approach to Segregation Reform*, U.S. DEP'T OF JUST. 6–9 (2016), https://www.bja.gov/publications/MorethanEmptyingBeds.pdf.

the use of weapons, and multi-man fights were reduced by 50 percent."[23]

## B.     Solitary Confinement Is Not Cost-Effective.

Limiting solitary confinement provides long-term savings. In 2013, the U.S. Government Accountability Office estimated that the annual cost of holding a person in solitary confinement could be triple the cost of holding them in the general population.[24] Similarly, the cost of constructing a supermax prison, built specifically for solitary confinement, could be triple the cost of conventional prison.[25] Solitary facilities require more robust staffing as isolated inmates cannot perform many of the jobs available in general population housing.[26] Further, isolation units require a higher ratio of correctional officers to inmates as policies mandate at least two officers move inmates between their cells, exercise areas, and showers.[27]

As of 2015, the Texas Department of Criminal Justice was spending $46 million a year for 4.4% of its prison population in administration segregation: an

---

[23] *Id.* at 6.

[24] *See* U.S. GOV'T ACCOUNTABILITY OFF., BUREAU OF PRISONS: IMPROVEMENTS NEEDED IN BUREAU OF PRISONS' MONITORING AND EVALUATION OF IMPACT OF SEGREGATED HOUSING 31 (May 2013).

[25] ACLU, BRIEFING PAPER: THE DANGEROUS OVERUSE OF SOLITARY CONFINEMENT IN THE UNITED STATES 2 (Aug. 2014), https://www.aclu.org/sites/default/files /assets/stop_solitary_briefing_paper_updated_august_2014.pdf.

[26] *Id.* at 11.

[27] *Id.*

13

additional cost of $7 thousand annually for each inmate.[28] Colorado estimated that isolated inmates cost the state an additional $15,000 annually,[29] and Colorado spent $20 million to house inmates in administrative solitary confinement in 2010 alone.[30] In 2009 in California, administrative segregation inmates each cost the state at least $14,600 more than general population inmates.[31] In 2023, California's average annual cost for all restrictive housing reached $410 million.[32]

In 2013 Illinois closed its supermax prison, Tamms, which had cost $64,000 per inmate annually, while general population prisons annually cost $21,000 per

---

[28] Douglas Smith, *Allow the Texas Department of Criminal Justice to Document and Review Its Policies Regarding Confinement in Administrative Segregation*, TEX. CRIM. JUST. COAL. (2015).

[29] *Testimony of Rick Raemisch, Executive Director of the Colorado Department of Corrections "Reassessing Solitary Confinement II: The Human Rights, Fiscal, and Public Safety Consequences"* 4 (Feb. 25, 2014), https://www.judiciary.senate .gov/imo/media/doc/02-25-14RaemischTestimony.pdf. Other groups believed that it cost Colorado as much as $21,485 more to house inmates in administrative segregation. Solitary Watch, *Fact Sheet: The High Cost of Solitary Confinement*, 1 (2011), https://solitarywatch.org/wp-content/uploads/2011/06/fact-sheet-the-high-cost-of-solitary-confinement.pdf.

[30] SOLITARY WATCH, *supra* n.29.

[31] David R. Shaw, *Special Review: Management of the California Department of Corrections and Rehabilitation's Administrative Segregation Unit Population*, OFF. OF THE INSPECTOR GEN. 3 (Jan. 2009), https://www.oig.ca.gov/media/reports /ARCHIVE/BOA/Reviews/Management%20of%20the%20California%20Departm ent%20of%20Corrections%20and%20Rehabilitation's%20Administrative%20Segr egation%20Unit%20Population.pdf.

[32] CAL RSCH. B., SOLITARY CONFINEMENT: SAFETY AND FISCAL COSTS/SAVINGS 3 (Feb. 2023), https://library.ca.gov/wp-content/uploads/crb-reports/FINALPolicy _Brief_Solitary_Confinement_TDLindsey_TDL_20230222.pdf.

inmate.[33] The governor's office estimated that closing Tamms would save the state more than $48 million in 2013 alone.[34] Mississippi saved nearly $6 million each year by closing a supermax facility in 2010; after closing one of its supermax prisons in 2012, Colorado estimated it saved more than $5 million that year and $2.2 million the following year.[35] In each state, reducing the use of solitary confinement also reduced ballooning corrections costs.

## II. PROLONGED SOLITARY CONFINEMENT CAUSES SERIOUS HARM TO INMATES' MENTAL AND PHYSICAL HEALTH.

Countless studies of prolonged solitary confinement detail the serious psychological harm it inflicts on inmates.[36] Forcing individuals to endure periods of isolation as punishment is comparable to "a form of torture."[37]

Inmates in solitary confinement report experiencing a range of psychological and behavioral afflictions including "severe depression, memory loss, suicidal tendencies, and an inability to relax, being unable to keep track of time due to the

---

[33] Steve Mills, *Quinn's Prison Plan Causes Stir*, CHICAGO TRIBUNE (Feb. 23, 2012), https://www.chicagotribune.com/news/ct-xpm-2012-02-23-ct-met-illinois-state-budget-prisons-20120223-story.html; *Tamms Supermaximum Security Prison Now Closed*, AMNESTY INT'L (Jan. 10, 2013), https://www.amnestyusa.org/victories /tamms-supermaximum-security-prison-now-closed/.

[34] Mills, *supra* n.33.

[35] U.S. GOV'T ACCOUNTABILITY OFF., *supra* n.24, at 34–35.

[36] *See, e.g.*, Laura Dellazzino et al., *Is Mental Illness Associated with Placement Into Solitary Confinement in Correctional Settings? A Systematic Review and Meta-Analysis*, 29 INT'L J. OF MENTAL HEALTH NURSING 576, 577 (2020).

[37] David H. Cloud et al., *Public Health and Solitary Confinement in the United States*, 105 AM. J. PUB. HEALTH 18, 24 (2015).

tiny window and a lack of natural daylight in the cell."[38] Prolonged isolation can lead to the development of social pathologies like impulse control.[39] Solitary inmates often experience a loss of identity, and they lash out as a means of eliciting any type of reaction to "reestablish their existence."[40] Social isolation can lead to its pathologic consequence: loneliness, which can permanently harm an individual's mental and physical health.[41]

The prevalence of suicide and self-harm in solitary confinement illustrate the dangers of isolation. Approximately fifty percent of inmate suicides occur in solitary confinement.[42] Detainees in solitary confinement in New York City jails were nearly seven times more likely to harm themselves than inmates in the general population.[43] This is not surprising; many isolated inmates deteriorate dramatically with adverse

---

[38] Human Rights Clinic at U. of Tex. Sch. of L., *Designed to Break You: Human Rights Violations on Texas' Death Row*, 21 (Apr. 2017), https://law.utexas.edu/wp-content/uploads/sites/11/2017/04/2017-HRC-DesignedToBreakYou-Report.pdf.
[39] Mischa H. Karplus, *Forgotten in Solitary: Mentally Ill Inmates in Solitary Confinement and How the Law Can Protect Them*, 19 STAN. J. CIV. RTS. & CIV. LIBERTIES 97, 104 (2023).
[40] *Id.*
[41] Craig Haney, *Restricting the Use of Solitary Confinement*, 1 ANN. REV. OF CRIMINOLOGY 285, 296–97 (2018).
[42] Stuart Grassian & Terry Kupers, *The Colorado Study vs. The Reality of Supermax Confinement*, 13 CORR. MENTAL HEALTH REP. 1, 11 (2011).
[43] Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 AM. J. PUB. HEALTH 442, 444 (2014).

psychological effects characterized by self-harm and suicide.[44] One individual who had been in isolation for almost twenty-five years described his confinement as being like an "endless toothache," or a

> [S]low constant peeling of the skin, stripping of the flesh, the nerve-wracking sound of water dripping from a leaky faucet in the still of the night while you're trying to sleep. Drip, drip, drip, the minutes, hours, days, weeks, months, years, constantly drip away with no end or relief in sight.[45]

It is not unusual for inmates in solitary confinement to swallow razors, smash their heads into walls, compulsively cut their flesh, and try to hang themselves.[46]

These "negative (sometimes severe) health effects can occur after only a few days of solitary confinement," and "[t]he health risk rises for each additional day in solitary confinement."[47] The psychological consequences are profoundly negative. Put simply, "there is not a single published study of solitary or supermax-like

---

[44] *See generally*, Mimosa Luigi et al., *Shedding Light on "the Hole": A Systematic Review and Meta-Analysis on Adverse Psychological Effects and Mortality Following Solitary Confinement in Correctional Settings*, 11 FRONTIERS IN PSYCH. 840 (2020).

[45] Jules Lobel, *Prolonged Solitary Confinement and the Constitution*, 11 U. PA. J. CONST. L. 115, 116 (2008) (internal quotations omitted).

[46] *See, e.g.*, David Fathi, *Supermax Prisons: Cruel, Inhuman and Degrading*, ACLU BLOG (July 9, 2010), https://www.aclu.org/blog/national-security/supermax-prisons-cruel-inhuman-and-degrading.

[47] Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 CRIME & JUST. 441, 495 (2006); *see also* Tracy Hresko, *In the Cellars of the Hollow Men: Use of Solitary Confinement in U.S. Prisons and Its Implications Under International Laws Against Torture*, 18 PACE INT'L L. REV. 1, 13 (2006) ("[T]he longer an individual experiences conditions of isolation, the likelier they are to develop significant mental illness.").

confinement in which nonvoluntary confinement lasted for longer than ten days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects."[48]

### A. Solitary Confinement Places Inmates at Risk for Developing Serious Mental Illnesses.

Inmates with mental health illnesses are overrepresented in restrictive housing, and there is a broad concern that isolation is used for "nuisance" inmates, rather than those who may threaten the safety and security of others.[49]

Solitary confinement placement can lead to higher incidences of Post-Traumatic Stress Disorder ("PTSD").[50] Many individuals in solitary experience a slew of psychological afflictions including anxiety, hypersensitivity, extreme paranoia, and panic attacks.[51] A comprehensive study of inmates in Washington State's supermax prisons concluded that mental illness was present in approximately thirty percent of segregated inmates, which was almost three times more common

---

[48] *Porter v. Clarke*, 923 F.3d 348, 356 (4th Cir. 2019) (internal quotations and emphasis omitted); *see also* Lobel, *supra* n.45, at 118 ("[N]o study of the effects of solitary . . . that lasted longer than 60 days failed to find evidence of negative psychological effects." (internal quotations omitted)).

[49] Sonja E. Siennick et al., *Revisiting and Unpacking the Mental Illness and Solitary Confinement Relationship*, JUST. Q. 1, 1–2 (2021).

[50] B.O. Hagan et al., *History of Solitary Confinement is Associated with Post-Traumatic Stress Disorder Symptoms Among Individuals Recently Released from Prison*, 95 J. URB. HEALTH 141–48 (2018).

[51] *Testimony of Craig Haney Before the U.S. Senate Judiciary Subcommittee on the Constitution, Civil Rights and Human* Rights, 10-11 (2012).

than for inmates in the general population.[52]

Symptoms that isolated inmates experience have been classified as a "specific psychiatric syndrome associated with solitary confinement." A study that examined the experiences of over 200 inmates throughout various facilities found many common symptoms including hypersensitivity to external stimuli, hallucinations, panic attacks, difficulties with thinking, and overt paranoia.[53]

**B. Solitary Confinement Often Exacerbates Physical Ailments.**

A comprehensive study examined physical symptoms that inmates experienced in solitary confinement and found an overwhelming trend in the deterioration of their physical health.[54] A 2019 study of California prisons found that 47.5% of inmates in solitary confinement experienced hypertension, compared to 16.5% in the general prison population.[55] Individuals in solitary confinement are also at a heightened risk for developing heart palpitations, insomnia, deterioration of eyesight, and sensory hypersensitivity — all of which can lead to an exacerbation of

---

[52] Thomas L. Hafemeister & Jeff George, *The Ninth Circle of Hell: An Eighth Amendment Analysis of Imposing Prolonged Supermax Solitary Confinement on Inmates with a Mental Illness*, 90 Denv. U.L. Rev. 1, 46–47 (2013).

[53] Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. UNIV. J. LAW & POL'Y 325, 333–36 (2006).

[54] Justin D. Strong et al., *The Body In Isolation: The Physical Health Impacts of Incarceration in Solitary Confinement*, 15 PLOS 1 (2020).

[55] Brie A. Williams et al., *The Cardiovascular Health Burdens of Solitary Confinement*, 34 J. GEN. INTERNAL MED. 1977, 1978 (2019).

preexisting medical conditions.[56]

An emerging body of research further demonstrates that the social deprivation associated with solitary confinement can cause individuals to experience "social pain," which the brain will process the same as physical pain.[57] Solitary confinement's level of social deprivation can fundamentally alter the brain's structure, which may inhibit cognitive and motor functioning.[58] Moreover, these changes are quick; even one week in solitary confinement can significantly alter the brain's electrical activity.[59]

Like so many others held in solitary confinement, Mr. Vidal experienced a range of physical ailments that were only worsened by the restrictive conditions he was forced to endure. ECF No. 126 ¶ 60–72. The lack of effective medical attention he received perpetuated his symptoms, and he was often left with no relief for his pain. *Id.* at ¶ 60–61. Moreover, the countless hours he spent in social isolation resulted in prolonged feelings of loneliness and emotional discomfort. *Id.* at ¶ 69. Mr. Vidal's time in solitary confinement, coupled with a lack of access to adequate

---

[56] Sharon Shalev, *Solitary Confinement as a Prison Health* Issue, inWHO GUIDE TO PRISONS AND HEALTH 27–35 (2014).

[57] John A. Sturgeon & Alex J. Zautra, *Social Pain and Physical Pain: Shared Paths to Resilience*, 6 PAIN MANAGEMENT 63 (2015).

[58] Yi-Ting Cheng et al., *Social Deprivation Induces Astrocytic TRPA1-GABA Suppression of Hippocampal Circuits*, 111 NEURON 1301 (2023).

[59] Federica Coppola, *The Brain in Solitude: An (Other) Eighth Amendment Challenge to Solitary Confinement,* 7 J. LAW & BIOSCI. 184, 208 n.172 (2019).

medical care, led to a profound deterioration in his mental and physical health.

## III. PRISONS CAN LIMIT THE USE OF SOLITARY CONFINEMENT THROUGH INDIVIDUAL CLASSIFICATION WITH MEANINGFUL AND REGULAR REVIEW.

"Instead of being cast as the solution to a problem, restricted housing has come to be understood by many as a problem in need of a solution."[60] And litigation has highlighted the risks to inmates in isolation.[61] But with meaningful and regular review of individual situations as well as of general practices, solitary confinement can be limited to truly necessary circumstances.

As of January 2025, forty-four states have introduced bills to ban or restrict solitary confinement, and forty of these states have passed at least one reform into law.[62] Across twenty states, more than eighty bills sought to prohibit continuous segregation for more than fifteen days, and three states — Connecticut, Nevada, and

---

[60] ASS'N OF STATE CORR. ADM'RS & THE ARTHUR LIMAN CTR. FOR PUB. INT. L. AT YALE L. SCH., AIMING TO REDUCE TIME-IN-CELL: REPORTS FROM CORRECTIONAL SYSTEMS ON THE NUMBERS OF PRISONERS IN RESTRICTED HOUSING AND ON THE POTENTIAL OF POLICY CHANGES TO BRING ABOUT REFORMS, 15 (Nov. 2016), https://law.yale.edu/sites/default/files/area/center/liman/document/aimingtoreduct ic.pdf.

[61] *E.g.*, *Fussell v. Vannoy*, 584 F. App'x 270 (5th Cir. 2014); *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019); *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431 (3d Cir. 2020).

[62] Unlock the Box Campaign, BANNING TORTURE: LEGISLATIVE TRENDS AND POLICY SOLUTIONS FOR RESTRICTING AND ENDING SOLITARY CONFINEMENT THROUGHOUT THE UNITED STATES 4 (Jan. 2023), https://unlocktheboxcampaign.org /wp-content/uploads/2023/01/UTB-BanningTorture-TrendReport-January2023 .pdf; Unlock the Box Campaign, *Data Tracker*, https://unlocktheboxcampaign .org/data-tracker/ (last visited Jan. 31, 2025).

New York — have passed this legislation.[63] This fifteen-day prohibition on continuous solitary meets the international standard set by the U.N. Standard Minimum Rules for the Treatment of Prisoners (the "Nelson Mandela Rules").[64] Additionally, recognizing that "solitary confinement is detrimental to a person's mental health and wellbeing and does little to increase safety,"[65] New York re-defined solitary confinement to "any form of cell confinement for more than seventeen hours a day."[66]

Safe and secure facilities must assess inmate risks and needs, as well as define expectations for behavior, including positive-behavior incentives.[67] Where an individual is placed in solitary confinement, the U.S. Department of Justice

---

[63] *Data Tracker*, *supra* n.75; CORR. LEADERS ASS'N & THE ARTHUR LIMAN CTR. FOR PUB. INT. L. AT YALE L. SCH., TIME-IN-CELL 2019: A SNAPSHOT OF RESTRICTIVE HOUSING BASED ON A NATIONWIDE SURVEY OF U.S. PRISON SYSTEMS, 83 (Sept. 2020), https://law.yale.edu/sites/default/files/area/center/liman/document/time-in-cell_2019.pdf.

[64] ASS'N OF STATE CORR. ADMNS. & LIMAN CTR. FOR PUB. INT. L. AT YALE L. SCH., REFORMING RESTRICTIVE HOUSING: THE 2018 ASCA-LIMAN NATIONWIDE SURVEY OF TIME-IN-CELL 92 (Oct. 2018), https://law.yale.edu/sites/default/files/area/center/liman/document/asca_liman_2018_restrictive_housing_released_oct_2018.pdf [hereinafter REFORMING RESTRICTIVE HOUSING].

[65] Press Release, Carl E. Heastie, Speaker, N.Y. Assembly, Speaker Heastie Statement on the HALT Solitary Confinement Act (April 1, 2021), https://nyassembly.gov/Press/?sec=story&story=96335.

[66] N.Y. COMP. CODES R. & REGS. 7, § 1.5(v).

[67] Virginia Hutchinson, Kristin Keller, & Thomas Reid, *Inmate Behavior Management: The Key to a Safe and Secure Jail*, U.S. DEP'T OF JUST., NAT'L INST. OF CORR. 8–10 (Aug. 2009), https://www.govinfo.gov/content/pkg/GOVPUB-J16-PURL-LPS117820/pdf/GOVPUB-J16-PURL-LPS117820.pdf.

recommends that an inmate's initial and ongoing placement in restrictive housing be regularly reviewed by a multi-disciplinary staff committee. This should include not only the leadership of the institution where the inmate is housed, but also medical and mental health professionals.[68]

The U.N. Handbook on the Management of High-Risk Prisoners contains similar guidance: an individualized "assessment of each prisoner should be undertaken upon admission to prison and repeated at regular intervals throughout a prisoner's sentence . . . to make sure that it is still relevant to the prisoner."[69] As of 2018, twenty-one states mandated panel review for inmates sent to isolation.[70]

For inmates held in administrative segregation, New York requires regular panel review.[71] The panel reviews the inmates' current behavior, the initial reasons for segregation, and any other relevant factors.[72] New York prisons may place inmates in administrative solitary confinement pending if the prison superintendent determines that maintenance of order or discipline in the prison requires their

---

[68] DOJ REPORT AND RECOMMENDATIONS, *supra* n.7, at 50, 95, 106.

[69] *See* U.N. OFF. ON DRUGS AND CRIME, *Handbook on the Management of High-Risk Prisoners* 11–12 (2016), https://www.unodc.org/documents/justice-and-prison-reform/HB_on_High_Risk_Prisoners_Ebook_appr.pdf.

[70] REFORMING RESTRICTIVE HOUSING supra n.67, at 62, 125 n.171.

[71] N.Y. COMP. CODES R. & REGS. 7 § 301.4(c) (2023) (weekly review "for the first two months and at least every 30 days thereafter"). Panel review is not mandated for inmates in disciplinary segregation, which is now limited to fifteen days of continuous segregation. *Compare id.*, *with* § 301.1-2.

[72] § 301.4(c)(1).

confinement.[73]

For inmates already struggling with their health, solitary confinement may pose a particularly severe health risk. The U.N. Handbook on Dynamic Security and Prison Intelligence advises prisons to use "[d]ifferent considerations [for] prisoners with mental illness, who should be held in conditions that take into account their mental health requirements, and which should be the least restrictive possible, balanced with the need for secure custody" such as specially designed medical units.[74] Because "an inmate's mental health symptoms [can] lead to placement or extension of placement" in solitary confinement, the Federal Bureau of Prisons requires psychologists to participate in prison disciplinary hearings to "advise . . . on the inmate's competency and responsibility" in light of his or her mental illness.[75]

Since 2011, New York has mandated daily physician visits, "clothing suited to the season and weather conditions," "a sufficient quantity of wholesome and nutritious food," and the maintenance of "[a]dequate sanitary and other conditions required for [their] health" for inmates in solitary confinement.[76] In 2022, New York law further prohibited any solitary confinement for "special populations," which

---

[73] § 301.4(a).

[74] U.N. OFF. ON DRUGS AND CRIME, *Handbook on Dynamic Security and Prison Intelligence* 16 (2015), https://www.unodc.org/documents/justice-and-prison-reform/UNODC_Handbook_on_Dynamic_Security_and_Prison_Intelligence.pdf.

[75] DOJ REPORT AND RECOMMENDATIONS, *supra* n.7, at 51–52.

[76] N.Y. CORRECT. L. § 137 (McKinney).

includes disabled inmates.[77] In New York, a disability can be any "physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function."[78]

In New York, when inmates face charges for alleged misconduct, they enjoy due process rights to present evidence in their defense. Inmates can call witnesses to testify in the facility proceedings,[79] and prison superintendents may issue subpoenas.[80] If prisons fail to call witnesses that an inmate has requested, the prison must provide a written explanation "stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented."[81]

When Mr. Vidal was sentenced to solitary confinement in March 2015 pending the determination of his disciplinary infraction, he did not have the benefit of New York's subsequent HALT Act legislation which would have limited his solitary penalty to a mere fifteen days. Instead, Mr. Vidal lived in solitary for over 180 days that year. Nevertheless, Mr. Vidal was entitled to due process — not only during his hearing, but throughout his entire time in solitary confinement. Denying

---

[77] N.Y. COMP. CODES R. & REGS. 7 § 301.4 (citing N.Y. COMP. CODES R. & REGS. 7, § 1.5(u)).

[78] N.Y. EXEC. L. § 292 (McKinney).

[79] N.Y. COMP. CODES R. & REGS. 7, § 254.5(a).

[80] N.Y. CORRECT. L. § 112 (McKinney).

[81] N.Y. COMP. CODES R. & REGS. 7, § 254.5(a). New York requires more due process than federal law, as the Supreme Court declined to mandate such written explanations. *Texeira v. Fischer*, 26 N.Y.3d 230, 233-34, 43 N.E.3d 358, 360 (2015) (citing *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974)).

25

him the right to call witnesses and present evidence critically undermined his defense, stripping him of the opportunity to challenge and potentially exonerate himself from the charges.[82]

Mr. Vidal's due process was further violated because he was forced to endure abhorrent conditions. Mr. Vidal had the right to receive basic necessities while in solitary confinement, but Mr. Vidal did not have "[a]dequate sanitary" conditions in his cell.[83] His cell was filthy, and officers left dirty mops inside his small, isolated cell. Compl. ¶ 126. Mr. Vidal did not have wholesome or nutritious food — instead, he only received small meals with poorly-cooked soy.[84] Mr. Vidal lacked adequate nutrition the entire time he was in solitary. Defendants failed to maintain "[a]dequate . . . conditions required for the health of the incarcerated individual" when temperatures reached almost ninety degrees outside and Mr. Vidal's metal cell felt unbearably hot and humid.[85] And Mr. Vidal suffered from significant hemorrhoids from sitting constantly, often because guards put him in physical restraints, but he was denied treatment for this and his other ailments. These aches and pains prevented Mr. Vidal from sleeping much, which in turn exacerbated the mental and emotional turmoil of his confinement.

---

[82] ECF No. 126 ¶ 20(a)-(e).
[83] N.Y. CORRECT. L. § 137 (McKinney).
[84] *Id.*; ECF No. 126 ¶ 48-50.
[85] N.Y. CORRECT. L. § 137; ECF No. 126 ¶ 42–43.

**CONCLUSION**

For the foregoing reasons, as well as those set forth in Plaintiff-Appellant's brief, the district court's summary judgment order should be reversed.

Respectfully submitted,

/s/ *Matthew Marchiori*
Matthew Marchiori
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Tel. (202) 637-6572
Fax (202) 637-5910
matthew.marchiori@
hoganlovells.com

Patience M. Tyne
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, N.Y. 10017-2513
Tel. (212) 918-3247
Fax (212) 918-3100
patience.tyne@hoganlovells.com

February 6, 2025                    *Counsel for Amici Curiae*

27

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitations in Fed. R. App. P. 29(a)(5) and 32(a)(7) because it contains 6,355 words, excluding those parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief was produced in the  proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.

/s/ *Matthew Marchiori*
Matthew Marchiori

28

## CERTIFICATE OF SERVICE

I certify that on February 6, 2025, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Matthew Marchiori*
Matthew Marchiori